**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**TRACY E. RUFF**,                        :        Case No. 1:14-CV-00778

       Plaintiff,                        :

v.                                            :

**COMMISSIONER OF SOCIAL SECURITY**,        :        **MEMORANDUM DECISION AND
                                                    JUDGMENT**

       **DEFENDANT.**                       :


# I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C. § 636 and FED. R. CIV. P. 73, the parties to this case have voluntarily consented to have the undersigned United States Magistrate Judge conduct any and all proceedings in the case, including ordering the entry of a final judgment.  Plaintiff seeks judicial review of a final decision of the Commissioner denying his Title II application for a  period of disability and disability insurance benefits (DIB) and his Title XVI application for supplemental insurance benefits (SSI). Pending before the Court are the parties' Briefs on the Merits (Docket Nos. 14 & 17) and Plaintiff's Reply Brief (Docket No. 17).   For the reasons set forth below, the Magistrate affirms the Commissioner's decision.

# II. PROCEDURAL AND FACTUAL BACKGROUNDS.

On July 21, 2010, Plaintiff completed an application for DIB, alleging that he became unable to work because of his disabling condition on June 26, 2010 (Docket No. 12, pp. 215-218 of 645).  Also on

July 21, 2010, Plaintiff applied for SSI, alleging that his disability began on January 29, 2010 (Docket No. 12, pp. 219-237 of 645).  The applications were denied initially (Docket No. 12, pp. 215-Tr. 47-49, 54-56) and upon reconsideration (Tr. 282).  Administrative Law Judge (ALJ) Traci M Hixon conducted an administrative hearing on November 15, 2011, in Cleveland Ohio, at which Plaintiff, represented by counsel and a Vocational Expert (VE) Debra Lee appeared and testified (Docket No. 12, p. 52 of 645).  The ALJ rendered a *partially favorable* decision on December 30, 2011 (Docket No. 12, pp. 16-18 of 645).  The Appeals Council denied Plaintiff's request for review on March 19, 2014, thereby rendering the ALJ's decision the final decision of the Commissioner  (Docket No. 12, pp. 5-7 of 645).

### III. THE ADMINISTRATIVE HEARING.

#### A.     PLAINTIFF'S TESTIMONY.

Born in 1965, Plaintiff was 46 years of age at the time of hearing.  He had completed high school and last maintained a valid driver's license in 2006..  He resided with his spouse with whom he had a strained relationship (Docket No. 12, pp. 55-59 of 645).

Plaintiff was trained as a cargo specialist in the United States Army (Docket No. 12, p. 57 of 645).  Thereafter, he installed and repaired cables and phone lines as a service technician for Cablevision and Ohio Bell.  His job duties included a customer service component requiring him to have contact with service subscribers (Docket No.12, pp. 66-67, 68-69 of 645).

With respect to his impairments, Plaintiff had been diagnosed with and treated for (1) angina; (2) a cleft foot; (3) diabetes mellitus; (4) depression; (5) hemihypertrophy, a disorder in which one side of the face or body grows more than the other, STEDMAN'S MEDICAL DICTIONARY 176620 (27th ed. 2000); (6) hypertension; and (7) the tuberculosis (TB) virus (Docket No. 12, pp. 57, 69 of 645).

After undergoing triple bypass surgery, Plaintiff continued to experience angina and dyspnea.  With

2

strenuous physical activity, the angina intensified thereby precipitating use of an additional dosage of Nitroglycerin.  The additional dosage of medication triggered cephalgia (Docket No. 12, pp. 69, 70, 71, 72-73, 74 of 645).

Drug therapy was used to control Plaintiff's blood pressure.  An added benefit of this medication regimen was that it also slowed Plaintiff's heart rate and regulated the onset of angina.  Similarly, drug and diet therapies had been effective in controlling his diabetes (Docket No. 12, pp. 73, 74, 75 of 645).

Plaintiff's symptoms of depression were episodic (Docket No. 12, p. 84 of 645).  He had a preoccupation with sleep because it provided  relief from  pain (Docket No. 12, pp. 85, 86 of 645).

Plaintiff tested positive for tuberculosis bacteria which was determined to be inactive.  As treatment, Plaintiff took pills for six months of the year to prevent  the bacteria from becoming active and developing  into the disease (Docket No. 12, p. 76 of 645).

A former smoker, Plaintiff testified that  he had abstained from alcohol during the past year and had last used cocaine in about March and last smoked marijuana in July  (Docket No. 12, pp. 57-58 of 645).  Plaintiff was relatively reclusive and he avoided prolonged family contact.  He noted that he is no longer outgoing and easy to get along with but that he has developed  a "quick temper," a trait for which he was seeking help (Docket No. 12, p. 62 of 645).

Plaintiff's treating physician suspected diabetic neuropathy as the cause of his total inability to grasp with his left hand, grasp no longer than 10 minutes with his right hand and write a single paragraph (Docket No. 12, pp. 80-81 of 645).  Plaintiff estimated that he had the physical ability to (1) pick up and carry three to four pounds; (2) stand for up to ten minutes before he "wanted" to sit down; (3) bend slowly; (4) kneel and (5) climb ten stairs.  He noted that lifting overhead resulted in orthostatic hypotension (Docket No. 12, pp. 77, 80, 82, 83 of 645).

During a typical day, Plaintiff woke up between 3:30 and 4:30 A.M. but delayed getting up until about 11:00 or noon to care for his personal needs including grooming and hygiene (Docket No. 12, pp. 58, 60, 63, 64 of 645).  Plaintiff heated his food, commercially prepared or by others, in the microwave (Docket No. 12, p. 58 of 645),  watched crime and sports shows on television and read the paper and *Sports Illustrated* (Docket No. 12, p. 61 of 645).  The side effects of his medication regimen included persistent sleepiness and lethargy so Plaintiff napped daily (Docket No. 12, pp. 64, 80 of 645).  Plaintiff's son assisted him with the laundry because it was typically too heavy for Plaintiff to lift. When available, his spouse helped him perform other household chores (Docket No. 12, pp. 58, 59 of 645).   When shopping, Plaintiff used a motorized cart (Docket No. 12, p. 59 of 645).  Plaintiff used  bus transportation for medical appointments and for the ALJ hearing (Docket No. 12, p. 56, 88 of 645).

## B.    THE VE TESTIMONY.

Based on Plaintiff's vocational information and testimony, the VE classified Plaintiff's past relevant work by the (1) occupational classification under the Dictionary of Occupational Titles (DOT); (2)skill level descriptions; (4) amount of effort required for the particular job; and (5) specific vocational preparation (SVP) or the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in the job-worker environment:

| DOT | SKILL LEVEL | EXERTION LEVEL | SVP |
|---|---|---|---|
| Cable television line technician 821.261-010 1997 to 2001 | SKILLED work requires qualifications in which the person uses his or her judgment to determine machine and manual operations to be performed in order to maintain the proper form, quality, or quantity of material to be purchased. 20 C.F.R. §§ 404.1568, 416.968 (c) | HEAVY work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. 20 C.F.R. §§ 404.1567(d), 416. 967(d). | 6 denotes that it takes an employee over one year and up to and including two years to perform this job. Www.onetonline.org/help/online/svp. |

4

| Line installer/repairer 822.381-014 2001 to 2005 | SKILLED- | HEAVY- | 7–over two years and up to an including four years. |
|---|---|---|---|

The skills acquired with these jobs would not transfer with little vocational adjustment to lower exertional

levels (Docket No. 12, p. 95 of 645).

The ALJ asked the VE to:

assume a person of Plaintiff's age, education and employment background and that this person was able to perform sedentary work, except that this person could not crouch, crawl, kneel, climb or work in extreme temperatures or around hazardous conditions. This person would perform simple, routine tasks with simple, short instructions making simple work-related decision and having few workplace changes.  Would this person be able to perform Plaintiff's past work?

The VE responded that Plaintiff's past work exceeded the sedentary work paradigm.  However, there was

light work, albeit limited, that a person with these restrictions could perform in the regional or national

economies at the sedentary level:

| JOB DESCRIPTION AND DOT | NORTHEAST OHIO | OHIO | NATIONAL |
|---|---|---|---|
| Cashiering jobs 211.462-018 | 2,800 | 8,400 | 200,000 |
| Assembly in electrical, electronic area 725.684-018 | 400 | 1,000 | 26,000 |
| Production workers 713.687-018 | 250 | 1,700 | 28,000 |

(Docket No. 12, p. 96 of 645).

In the second hypothetical question, the ALJ asked that the VE to consider the impact on the jobs

set forth above if she added to hypothetical one the fact that the hypothetical worker would have minimal

contact with the public and superficial contact with co-workers and supervisors.  The VE responded that

these limitations would eliminate the cashier position.  The other jobs would not require public contact

(Docket No. 12, p. 96 of 645).  The VE affirmed that if this hypothetical worker was absent from work

at least three times per month, competitive employment would be excluded.  Similarly, if the hypothetical

worker were to fall asleep one to two times weekly for 10 minutes at a time, he or she would be unable to sustain employment in a production setting (Docket No. 12, pp. 97, 98, 99 of 645).

## IV. MEDICAL EVIDENCE.

### A.    METROHEALTH MEDICAL CENTER (MHMC)

In January 2007, Plaintiff underwent a heart catheterization, the results of which confirmed diffuse coronary artery disease (CAD) with mild left anterior descending artery.  Although he had significant blockage, surgical intervention was contraindicated so medication management and lifestyle changes were encouraged (Docket No. 12, p. 426 of 645).  Thereafter, from June 18, 2007 through September 20, 2010 and March 8, 2011 through August 8, 2011, Plaintiff was treated by a diffuse group of medical professionals in the Anti-Coagulation, Cardiology and Pain Management Clinics at MHMC.

On June 18, 2007, Plaintiff was admitted to MHMC with complaints of increased chest pain. During the course of his hospital stay, treatment methods were undertaken to gain control of Plaintiff's diabetes and regulate his chest pain (Docket No. 12, pp. 425-429 of 645).

When Plaintiff presented to the Pain Management Clinic on August 23, 2007, his verbal pain intensity rating was a three on a numeric pain rating scale of one to ten where zero denotes no pain and 10 denotes the worst possible pain.  To gather information about how well Plaintiff's heart worked during physical activity, a stress test and echocardiogram were administered (Docket No. 12, p. 419 of 645).

On November 13, 2007, Dr. Daniel T. Friedman, D.O., a cardiologist, opined that as a consequence of very small heart vessels, Plaintiff was not a candidate for angioplasty.  Dr. Friedman suggested instead that Plaintiff undergo catheterization and transmyocardial revascularization (TMR), a procedure used to improve blood supply through the coronary arteries to the heart in people with inoperable heart disease (Docket No. 12, pp. 419-424 of 645; www.healthgrades.com/physician/dr-

6

daniel-friedman; STEDMAN'S MEDICAL DICTIONARY 355090 (27th ed. 2000)).

While watching television, Plaintiff experienced an exacerbation of chronic stabbing chest pain which lasted five minutes.  Plaintiff presented to the hospital on December 7, 2007, and was prescribed Lopressor, a beta blocker, started on Heparin, an anticoagulant, and given an intravenous antiplatelet medicine used to prevent the formation of blood clots (Docket No. 12, pp. 413-418 of 645).

During consultative examinations on December 7, 2007 and February 15, 2008, the examiners corroborated Plaintiff's claim that physical activity triggered angina (Docket No. 12, pp. 400, 406 of 645).   On February 23, 2008, Dr. Friedman determined that since the positron emission tomography scan (PETS) of Plaintiff's body was nondiagnostic, it should be reordered.  Dr. Friedman suggested that Plaintiff's limited treatment options included TMR, a heart transplant or further evaluation by a cardiothoracic surgeon (Docket No. 12, pp. 400-405 of 645).

On February 27, 2008, Dr. Friedman ordered an echocardiogram and a PETS to assess myocardial viability.  For immediate relief, Dr. Friedman prescribed a beta blocker used to treat hypertension and improve chest pain (Docket No. 12, pp. 406-412 of 645).

Plaintiff presented with exacerbated chest symptoms on June 26, 2008.  Notably, Plaintiff had been out of medication for the past few days (Docket No. 12, pp. 395-399 of 645).

Plaintiff was admitted to the hospital on August 13, 2008, with atypical angina.  While his chest X-ray showed normal results, the radiological evidence revealed ventricular concentric hypertrophy and systolic dysfunction in both the basal inferior and mid-inferior walls.  Plaintiff was considered an unacceptable candidate for stenting (Docket No. 12, pp. 390-394, 449-451, 454-455 of 645).

On August 15, 2008, Plaintiff underwent catheterization.  The indications suggested triple-vessel CAD with severe diffuse distal disease (Docket No. 12, pp. 452-454 of 645).

On September 3, 2008, Dr. Inderjit S. Gill, a thoracic surgeon, opined that Plaintiff had limited coronary blood flow and myocardial substrate utilization; therefore, he was not a good candidate for coronary artery bypass grafting.  Dr. Gill recommended that Plaintiff undergo TMR (Docket No. 12, pp. 389-390 of 645; www.healthgrades.com/physician/dr-inderjit-gill).

Plaintiff presented to the emergency room on December 16, 2008, with complaints of right calf pain and difficulty ambulating (Docket No. 12, pp. 375-376 of 645).  Results from the echocardiogram revealed, *inter alia,* abnormal left ventricular systolic function and moderate decreased body movement of the mid-inferior wall (Docket No. 12, pp. 446-448 of 645).

On December 17, 2008, Plaintiff was admitted to the hospital where he was diagnosed with arterial occlusion.  Upon removal of a vein clot, Plaintiff was started on Coumadin, an anticoagulant, for arterial thrombus (Docket No. 12, pp. 371-374 of 645).

On December 18, 2008, a vascular surgeon Dr. Christopher J. Smith, M. D., conducted an evaluation and focused on ruling out peripheral vascular disease.  To that end, he ordered radiological tests, which showed:

- An absence of distal ischemia in the right ankle while at rest.
- An absence of distal ischemia in the left ankle at rest.
- Normal Doppler waveforms throughout the left leg were triphasic and of normal amplitude.
- Normal Doppler waveforms throughout the left leg were triphasic and of normal amplitude (Docket No. 12, pp. 444-445 of 645; www.healthgrades.com/physician/dr-christohper-smith).

On December 23, 2008, Plaintiff entered into an anticoagulation agreement after undergoing new patient teaching on the use of Coumadin.  The curriculum included the rationale for its use as treatment, goals of therapy, adverse reactions and its interaction with food, drink and other medicines.  (Docket No. 12, pp. 367-369 of 645).

Plaintiff met with Dr. Pradeep Bhat M.D., a cardiologist, on January 28, 2009 and March 30, 2009.  Plaintiff reported new, intense chest pain precipitated by activity.  Concurring in the diagnosis of three-vessel CAD, Dr. Bhat continued the current heart medication regimen.  The diagnostic tests showed that Plaintiff had poor control of his diabetes and suboptimal control of his hypertension and lipid functions (Docket No. 12, pp. 360-362, 363-366 of 645; www.healthgrades.com/physician/dr-pradeep-bhat).

On August 14, 2009, Plaintiff was medication compliant, his angina was stable and he was still taking Coumadin.  Dr. Friedman reiterated that Plaintiff "needed to get" TMR (Docket No. 12, pp. 354-358 of 645).

Plaintiff submitted to vascular studies and on April 29, 2009, Dr. J. Jeffrey Alexander, M.D., a specialist in internal medicine, found (1) normal triphasic arterial waveforms throughout the right lower extremity; (2) normal triphasic arterial waveforms throughout the left lower extremity; and (3) normal Doppler arterial examination of the lower extremities (Docket No. 12, pp. 442-443 of 645; www.healthgrades.com/physician/dr-jeffrey-alexander).

After examination by a resident physician in the Ophthalmology Department on August 20, 2009, Plaintiff's fluctuating flurry vision was attributed to uncontrolled hypertension (Docket No. 12, pp. 349-353 of 645).

Dr. Bhat correlated Plaintiff's complaints of headaches with the commingling of over-the-counter drugs and an anticoagulant.  On November 23, 2009, Dr. Bhat continued the anticoagulant therapy (Docket No. 12, pp. 346-347 of 645).

On February 11, 2010, and February 18, 2010, Plaintiff presented to the emergency room complaining of chest pain following cocaine use.  During the first visit, Plaintiff's cardiac silhouette,

mediastinum and bony thorax were within normal limits and his lungs were clear.  He left the hospital without treatment against medical advice (Docket No. 12, pp. 336-344, 440 of 645).  During his second visit, Dr. Bhat identified Plaintiff's existing medical issues and against medical advice, Plaintiff left without receiving treatment (Docket No. 12, pp. 330-333 of 645).

On July 19, 2010, Plaintiff presented with chest and back pain which had persisted for three days. Admittedly, Plaintiff had not been compliant with his diet and medication regimens and he showed signs of excessive urination, stomach ache and lightheadedness.  The immediate physical problems were resolved and Plaintiff was referred to a social worker (Docket No. 12, pp. 319-324 of 635).

Stress was manifested in Plaintiff's body as dyspnea and angina.  On July 26, 2010, Dr. Mahazarin R. Ginwalla, M.D., a cardiovascular specialist, ordered a nuclear stress test to evaluate for ischemia as a forerunner to determining if Plaintiff would benefit from TMR and prescribed medication generally used to treat gastroesohageal reflux disease (Docket No. 12, pp. 324-328 of 645; http://doctor.webmd.com/doctor/mahazarin-ginwalla).

On August 2, 2010, Plaintiff's admission to the registered nurse that he had a beer over the weekend, prompted counseling with a certified nurse practitioner on anticoagulant management (Docket No. 12, pp. 318-323 of 645).  Having neglected to take his anticoagulant for the past two days, Plaintiff sought urgent care on September 13, 2010, for severe angina which was unresponsive to Nitroglycerin. The radiographic evidence of Plaintiff's chest showed acute cardiopulmonary process and left ventricular hypertrophy.  An anticoagulant was introduced intravenously to reduce the risk of deep vein thrombosis (Docket No. 12, pp. 303-317, 437, 439 of 645).

Dr. Bhat completed the BASIC MEDICAL and the MENTAL FUNCTIONAL CAPACITY ASSESSMENT forms provided by the Ohio Job and Family Services on September 13, 2010, finding that Plaintiff's

symptoms were disabling and he needed definite treatment.  The combined effects of these medical conditions on physical functional capacity, limited Plaintiff to:

- Standing no more than one hour in an eight-hour workday.
- Standing for 10 minutes without interruption.
- Sitting in an eight-hour workday varied.
- Lifting/carrying up to 5 pounds frequently and occasionally.
- Marked limitations in pushing/pulling, bending, reaching, handling and engaging in repetitive hand movements (Docket No. 12, pp. 609-610 of 645).

With respect to Plaintiff's mental functional capacity, Dr. Bhat did not identify any marked limitations arising from Plaintiff's impairments.  Dr. Bhat did, however, find that Plaintiff was not significantly limited in the ability to:

- Interact appropriately with the general public.
- Ask simple questions or request assistance.
- Maintain socially appropriate behavior.
- Be aware of normal hazards and take appropriate precautions.
- Travel in unfamiliar places (Docket No. 12, pp. 611-612 of 645).

The electrocardiography study administered on September 14, 2010, showed a markedly slow heart beat and the stress test showed a small area of mild blockage in the basal anterolateral wall and evidence of a large scar on the entire inferior wall (Docket No. 12, pp. 434-436, 477 of 645).

On September 15, 2010, results from the single photon emission computed tomography (CT) study showed large, moderate severity, fixed perfusion defect involving the entire inferior wall and small, mild severity, reversible perfusion defects involving the basilar/mid segment of the anterolateral wall, suggesting partial or complete blockage of Plaintiff's coronary arteries (Docket No. 12, pp. 432 of 645).

On September 20, 2010, Plaintiff presented with debilitating angina, having failed compliance again with anticoagulation or diet regimen.  Plaintiff's blood pressure was slightly elevated and he was prescribed a calcium channel blocker to relieve his angina and regulate his blood pressure (Docket No. 12, pp. 294-298 of 645).

11

Plaintiff obtained medical coverage and expressed a desire to restart his anticoagulation therapy when presenting to the Anti-Coagulation Clinic on December 1, 2010.  Plaintiff was restarted on Warfarin pending an appointment with a primary care physician (Docket No. 12, pp. 475-476 of 645).

On January 4, 2011, Plaintiff presented to Dr. Imran Sheikh, M.D., a specialist in clinical cardiac electrophysiology, with a complaint of right arm numbness that radiated to his finger tips and hand.  Dr. Sheikh suggested that (1) the tingling could be a by-product of a vitamin deficiency and (2) Plaintiff should consider TMR (Docket No. 12, pp. 467-474 of 645; www.healthgrades/physician/dr-imran-sheikh).

Dr. Bhat determined on January 8, 2011, that Plaintiff had not been medication compliant, in part because he could not tolerate nitrates.  He refilled his prescriptions and referred him for possible TMR (Docket No. 12, pp. 463-466 of 645).

On March 8, 2011, Dr. Najmul Siddiqi. M.D., a specialist in internal medicine, referred Plaintiff for a CT scan prior to a contemplated TMR.  Plaintiff was referred to vascular surgery for clarification on the duration of anticoagulation therapy (Docket No. 11, pp. 574-576 of 645; www.healthgrades.com/physician/dr-majmul-siddiqi).

Plaintiff presented for consultation with Dr. Lisa S. Roth, D.P.M, a specialist in podiatric surgery, on March 9, 2011, complaining that the right foot experienced cold and the left foot did not.  Dr. Roth recommended that as a practical matter, Plaintiff change his right foot attire.  Medically, she suggested that Plaintiff undergo vascular testing and a work-up for possible vitamin deficiencies (Docket No. 11, pp. 570-573 of 645; www.healthgrades.com/provider/lisa-roth).

On April 22, 2011, Dr. Bhat increased the dosage of the calcium channel blocker and switched Plaintiff to Crestor, a medication used to lower lipid and triglyceride levels.  Plaintiff's hypertension was

12

optimally controlled and his medication regimen was continued (Docket No. 12, pp. 565-569 of 645).

When Plaintiff presented to Dr. Siddiqi on June 7, 2011, his diabetes mellitus and hypertension were under fair control.  Plaintiff complained of excessive sweating and cramps in his neck and hands but declined acceptance of a prescription for treatment due to side effects.  Dr. Siddiqi ordered an ophthalmology examination and a vascular lab arterial study (Docket No. 12, pp. 555-561 of 645).

On June 8, 2011, Dr. Frits Van Der Kuyp, M.D., a specialist in public health and general preventive medicine, determined that Plaintiff had not been exposed to tuberculosis and infected with the tuberculosis bacterium (Docket No. 12, pp. 550-554 of 645; www.healthgrades.com/physician/dr-frits-van-der-kuyp).

During June and July 2011, Plaintiff underwent numerous peri-operative examinations:

A left heart catheterization administered on June 10, 2011, showed triple vessel CAD involving severe disease in left circumflex artery, and moderate disease in left anterior descending artery.  Attempts to pass a balloon past the distal vessel, near the occlusion was a failure (Docket No. 11, pp. 544-549 of 645).  Radiographic tests administered on June 13, 2011, confirmed diffuse irregularities in the coronary arteries (Docket No. 12, pp. 537-549 of 645).  A pulmonary function test administered on June 14, 2011, registered essentially normal results (Docket No. 12, pp. 530-531 of 645).  An echocardiogram administered on June 29, 2011, confirmed the diagnosis of coronary atherosclerosis demonstrated by abnormal left ventricular systolic function and hypertrophy (Docket No. 12, pp. 521-529 of 645).  A chest X-ray administered on July 1, 2011, showed a borderline enlarged cardiac silhouette and mild collapsed lung (Docket No. 12, pp. 598-600 of 645).  A transesophageal echocardiography report generated on July 1, 2011, confirmed abnormal systolic function, hypokinesia of the mid-inferior wall and an abnormal left ventricular filling pattern (Docket No. 12, pp. 600-608 of 645).  A chest X-ray administered on July 3, 2011, showed mild lung disease affecting the left and bottom parts of the lung and tiny left apical collapsed lung (Docket No. 11, pp. 587-589, 594- of 645).  A transthoracic echocardiogram administered on July 5, 2011, showed abnormal left ventricular systolic function (Docket No. 11, pp. 591-593 of 645).  A vascular study conducted on July 6, 2011, showed that the left ventricle systolic function was focally abnormal and there was mild pulmonary hypertension (Docket No. 12, pp. 591-593 of 645).  On July 14, 2011, Plaintiff underwent heart surgery (Docket No. 12, pp. 13, 14 of 645).

On July 18, 2011, the chest X-rays showed minute residual left collapsed lung, small pleural

13

effusion and changes in the left base of the lung.  Plaintiff's right lung was clear and his heart was normal in size (Docket No. 12, p. 595 of 645).  Plaintiff presented on July 19, 2011, to the Community Care Clinic, for hospital admission follow-up regarding postoperative chest discomfort, dyspnea on exertion, palpitations, difficulty sleeping due to excessive sweating and right leg edema.  Plaintiff's chest pain was correlated to postoperative changes and he was prescribed a compression stocking to assist with leg swelling and a sleep aid (Docket No. 11, pp. 508-515 of 645).

On August 2, 2011, Plaintiff's appropriateness and risk stratification for cardiac rehabilitation were assessed.  Certified nurse practitioner Lisa M. O'Brien concluded that Plaintiff was a proper candidate for enrollment in the outpatient cardiac rehabilitation at moderate risk (Docket No. 12, pp. 502-506 of 645).

On August 9, 2011, Plaintiff presented for a follow-up after surgery.  His adverse symptoms had improved but not resolved.  Dr. Bhat suggested that Plaintiff may have had more than one type of pain so he was referred for further pain management.  Medication was prescribed to assist Plaintiff control his elevated lipid profile and his hypertension (Docket No. 12, pp. 496-501 of 645).

**B.**     **UNIVERSITY HOSPITALS CASE MEDICAL CENTER (UHCMC)**

Plaintiff admitted using a combination of cocaine/marijuana on Friday and thereafter on Sunday, he experienced angina.  Having run out of Nitroglycerin, Plaintiff presented to UHCMC on April 13, 2010, where Dr. Anne Hamik, M.D., Ph.D., a cardiology specialist, diagnosed Plaintiff with cocaine induced contraction of the blood vessels, resolving.  The diagnostic  evidence showed stable diabetes mellitus and an elevated level of anticoagulant that exceeded therapeutic normalization, resolved (Docket No. 12, pp. 615-617, 618-620, 635-640 of 645; www.healthgrades.com/physician/dr-anne-hamik).

On September 23, 2011, Plaintiff underwent an echocardiogram, perfusion scan and stress test. The echocardiogram results showed a normal left ventricular systolic function, abnormal left ventricular diastolic filling, left atrium moderate dilation, and evidence of mild pulmonary hypertension (Docket No. 12, pp. 625-627 of 645).   The perfusion scan produced quantitative data that was consistent with decreased flow to Plaintiff's heart muscle precipitated by partial or complete blockage of his arteries (Docket No. 12, pp. 628-629 of 645).  Plaintiff did not suffer chest pain during the stress test; however, with the injection of the radioactive substance into Plaintiff's vein, his heart rate lowered.  At maximum infusion, there was no electrocardiographic evidence of decreased blood flow to Plaintiff's heart (Docket No. 12, pp. 623-624 of 645).

On September 27, 2011, Dr. Virginia Louise Wong, M.D., performed a non-invasive vascular study of the lower extremity.  There was no evidence of deep vein thrombosis in the visualized vessels (Docket No. 12, pp. 621-622 of 645).

Plaintiff underwent a catheterization on October 3, 2011, the results of which confirmed the severity of the three-vessel CAD, the diffuse small vessel disease and the extent of occlusion (Docket No. 12, pp. 643-645 of 645).

## C.    CLEVELAND CLINIC HOSPITAL, LAKEWOOD HOSPITAL (LAKEWOOD).

On July 14, 2011, Plaintiff presented complaining of chest pain.  The attending physician noted that Plaintiff had recently had open heart surgery and there was radiographic evidence of cardiomegaly and possible small left pleural effusion.  Plaintiff was diagnosed with post coronary bypass inflammation of the fibrous sac surrounding the heart (Docket No. 12, pp. 478-491 of 645).

On July 27, 2011, Plaintiff presented with chest pain that he had experienced for two days.  He was given a narcotic pain reliever and advised about pain management (Docket No. 12, pp. 479-481 of

15

645).

**C.     DR. MARGARET ZERBA, PH. D., A PSYCHOLOGIST.**

On October 25, 2010, Dr. Zerba made the following notable observations:

•      Plaintiff appeared depressed with flat affect.
•      Plaintiff did not report problems with anxiety or panic attacks.
•      Plaintiff had paranoid and persecutory ideations related to his congenital condition (club foot and cleft palate).
•      Plaintiff had limited insight.
•      Plaintiff was functioning within the low-average range of intelligence at best (Docket No. 12, pp. 457-459 of 645).

Dr. Zerba summarized Plaintiff's mental health disorders using the multiaxial approach adopted by the American Psychiatric Association in the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDER, a manual which covers all mental health disorders and potential treatment:

| Axis | What it measures | Dr. Zerba's opinion |
|---|---|---|
| I.  Clinical symptoms. | This is what is typically thought of as the diagnosis (e.g., depression, schizophrenia, social phobia). | Adjustment disorder |
| II. Developmental Disorders & Personality Disorders. | Developmental disorders include autism and mental retardation, disorders which are typically first evident in childhood. Personality disorders are clinical syndromes which have a more long lasting symptoms and encompass the individual's way of interacting with the world.  They include Paranoid, Antisocial, and Borderline Personality Disorders. | No diagnoses. |
| III.  Physical conditions that play a role in the development, continuance or exacerbation of Axis I and II disorders. | Physical conditions such as brain injury or HIV/AIDS that can result in symptoms of mental illness are included here. | Born with cleft palate and clubfoot, had three clogged arteries, two heart attacks, diabetes, hyperlipidemia and hypertension. |

16

| IV. Severity of psychosocial stressors. | Events in a person's life, such as death of a loved one, starting a new job, college, unemployment, and even marriage can impact the disorders listed in Axis I and II. These events are both listed and rated for this axis. | Chronic pain, medical problems and unemployment |
|---|---|---|
| V. Highest level of functioning. | On the final axis, the clinician rates the person's level of functioning both at the present time and the highest level within the previous year. This helps the clinician understand how the above four axes are affecting the person and what type of changes could be expected. | Moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers). |

In describing the four work-related mental capabilities, Dr. Zerba determined that Plaintiff's ability to understand and follow directions and pay attention to perform simple, repetitive tasks was not impaired; but his ability to relate to others in the work environment and withstand the pressures of day-to-day work activity was moderately impaired due to depression, problems with sleep, paranoid ideations and persecutory ideations (Docket No. 12, pp. 457-461 of 645).

## V. THE DISABILITY REQUIREMENT AND THE SEQUENTIAL EVALUATION.

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)). The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical. *Id.*

When determining whether a person is entitled to disability benefits, the Commissioner follows

17

a sequential five-step analysis set forth in 20 C.F.R. §§ 404.1520 and 416.920.  *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 512 (6th Cir. 2010).

> First, a claimant must demonstrate that he or she is not currently engaged in substantial gainful employment at the time of the disability application.  *Id.* (*citing* 20 C.F.R. § 404.1520(b)).  Second, the claimant must show that he or she suffers from a severe impairment.  *Id.* (*citing* 20 C.F.R. § 404.1520(c)).  Third, if the claimant is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months, which meets or equals a listed impairment, he or she will be considered disabled without regard to age, education, and work experience.  *Id.* (*citing* 20 C.F.R. § 404.1520(d)).  Fourth, if the Commissioner cannot make a determination of disability based on medical evaluations and current work activity and the claimant has a severe impairment, the Commissioner will then review claimant's residual functional capacity (RFC) and relevant past work to determine if he or she can do past work; if so, he or she is not disabled.  *Id.* (*citing* 20 C.F.R. § 404.1520(e); *Howard v. Commissioner of Social Security*, 276 F.3d 235, 238 (6th Cir.2002)).  If the claimant's impairment prevents him or her from doing past work, the analysis proceeds to the fifth step where the Commissioner will consider the claimant's RFC, age, education and past work experience to determine if he or she can perform other work.  *Id.*  If the claimant cannot perform other work, the Commissioner will find him or her disabled.  *Id.* (*citing* 20 C.F.R. § 404.1520(f)).

### VI.  SUMMARY OF THE ALJ'S DECISION.

Under ACQUIESCENCE RULING 98-3(6) and 98-4(6), absent new and material evidence documenting a significant change in Plaintiff's condition, a residual functional capacity and findings pertaining to past relevant work made in a prior hearing decision by an ALJ are binding on ALJ Hixson provided the new claim arises under the same title of the Social Security Act.  Here, there is new and material evidence which documents a significant change in Plaintiff's condition; therefore, Plaintiff was not disabled prior to July 14, 2011, but became disabled on that date and has continued to be disabled through the date of the decision, December 30, 2011.  Plaintiff was not under a disability within the meaning of the Act at any time through December 31, 2010, the date last insured.

Upon careful consideration of the entire record, ALJ Hixson specified that:

1.     Plaintiff met the insured status requirements of the Social Security Act (Act) through

18

December 31, 2010.

2.  Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date.

3.  Since the amended alleged onset date of disability, January 29, 2010, Plaintiff had the following severe impairments:  (1) adjustment disorder with depression; (2) coronary artery disease; and (3) diabetes mellitus.

4.  Since the amended alleged onset date of disability, January 29, 2010, Plaintiff had not had an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, prior to July 14, 2011, the date Plaintiff became disabled, Plaintiff had the residual functional capacity to perform sedentary work with the following additional limitations:  (1) no crouching, crawling, kneeling or climbing; (2) no exposure to extreme temperatures and hazardous conditions; (3) must perform simple routine tasks, with simple, short instructions and make simple work decisions with few workplace changes; (4) minimal contact with the public;  and (5) superficial contact with co-workers and supervisors.

6.  After careful consideration of the entire record, the ALJ found that beginning on July 14, 2011, Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), subject the following conditions:  (1) no crouching crawling, kneeling or climbing; (2) no exposure to extreme temperatures and hazardous conditions; (3) simple, routine tasks, with minimal contact; and (4) absent from work three days per month.

7.  Since June 26, 2010, Plaintiff had been unable to perform any past relevant work.

8.  Prior to the established disability onset date, Plaintiff was a younger individual age 18-44.  Plaintiff's age category had not changed since the established disability onset date.

9.  Plaintiff had at least a high school education and was able to communicate in English.

10.  Prior to July 14, 2011, transferability of job skills was not material to the determination of disability because using the Medical Vocational Rules as a framework supported a finding that Plaintiff was not disabled whether or not he had transferable job skills. Beginning on July 14, 2011, Plaintiff had not been able to transfer job skills to other occupations.

11.  Prior to July 14, 2011, considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.

12. Beginning on July 14, 2011, considering Plaintiff's age, education and work experience and residual functional capacity, there were no jobs that exist in significant numbers in the national economy that Plaintiff could perform.

13. Plaintiff was not disabled prior to July 14, 2011, but became disabled on that date and had continued to be disabled through the date of the decision.

14. Plaintiff was not under a disability within the meaning of the Act at any time through December 31, 2010, the date last insured.

15. Plaintiff's substance use disorder was not a contributing factor material to the determination of disability (Docket No. 12, pp. 20-34 of 645).

## VII. STANDARD OF REVIEW.

Pursuant to 42 U. S. C. § 405(g), this Court has jurisdiction to review the Commissioner's decisions. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (1994). Judicial review of the Commissioner's decisions proceeds along two lines: whether the Commissioner employed the correct legal standards and whether the ALJ's findings are supported by substantial evidence. *Id*. (*citing Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* (*citing Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied,* 103 S. Ct. 2428 (1983)). The reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Id.* (*citing Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir.2007). Rather, the reviewing court must examine the administrative record as a whole and if the Commissioner's

decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion, *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

## IX. ANALYSIS

Plaintiff argues that the ALJ's decision finding him not disabled is neither based on correct legal principles nor supported by substantial evidence. Plaintiff contends that there are five claims on which the Court should reverse and remand the Commissioner's decision:

1. The ALJ failed to give Dr. Bhat's opinions controlling weight.
2. Dr. Gahman's opinions are not based on the entirety of the medical evidence and such opinions are replete with internal inconsistencies.
3. The ALJ discussed his daily activities but did not adequately relate those activities to his ability to work on a sustained basis.
4. If the ALJ failed to consider Plaintiff's noncompliance with drug therapy or drug use under SSR 96-7p.
5. The ALJ failed to determine the onset date consistent with SSR 83-20.

### A. DID THE ALJ FAIL TO GIVE CONTROLLING WEIGHT TO DR. BHAT'S OPINIONS?

Plaintiff argues that the ALJ exempted from the controlling weight presumption, Dr. Bhat's impressions on the BASIC MEDICAL FORM. To the extent that Dr. Bhat's assessment was relevant to Plaintiff's ability to sustain eight hours of activity, the ALJ improperly determined that such opinions deserved "some weight."

#### 1. TREATING PHYSICIAN STANDARD OF REVIEW.

An ALJ is bound to adhere to certain governing standards when assessing the medical evidence in support of a disability claim. *Gentry v. Commissioner of Social Security*, 741 F.3d 708, 723 (6th Cir. 2014) (*citing Wilson v. Commissioner of Social Security,* 378 F.3d 541, 545 (6th Cir.2004)). Chief among these is the rule that the ALJ must consider all evidence in the record when making a

21

determination, including all objective medical evidence, medical signs, and laboratory findings. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513). The second is known as the "treating physician rule," *Id.* (*see Rogers v. Commissioner of Social Security*, 486 F.3d 234, 242 (6th Cir. 2007), requiring the ALJ to give controlling weight to a treating physician's opinion as to the nature and severity of the claimant's condition as long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2) (language moved to 20 C.F.R. § 404.1527(c)(2) on March 26, 2012)).

The premise of the rule is that treating physicians have the best detailed and longitudinal perspective on a claimant's condition and impairments and this perspective "cannot be obtained from objective medical findings alone." *Id.* (*citing* 20 C.F.R. § 416.927(d)(2) (language moved to 20 C.F.R. § 416.927(c)(2) on March 26, 2012)). Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.* (*citing Rogers, supra,* 486 F.3d at 242). In all cases, the treating physician's opinion is entitled to great deference even if not controlling. *Id.* The failure to comply with the agency's rules warrants a remand unless it is harmless error. *Id.* (*see Wilson*, *supra,* 378 F.3d at 545–46).

### 2. THE WEIGHT GIVEN DR. BHAT'S OPINIONS.

There is no dispute that Dr. Bhat is a treating physician and that his opinions are generally supported by the results from his evaluations, observations, history of treatment and clinical findings. The ALJ held to the heightened standard of "reason giving" reserved for treatment sources when she provided a categorical assessment of Dr. Bhat's opinions related primarily to the diagnosis of CAD and

the inability to resolve Plaintiff's symptoms with conservative measures (Docket No. 12, pp. 23-24, 27-28 of 645). The ALJ comprehensively set forth the reasons that Dr. Bhat's opinions in that regard were entitled to controlling weight and she conducted a separate analysis of Dr. Bhat's opinion of Plaintiff's maximum residual functional capacity as set forth in the BASIC MEDICAL FORM, giving it less weight.

The ALJ may reject a treating source's conclusion concerning a claimant's maximum residual functional capacity when good reasons are identified for not accepting it. *Swain v. Commissioner of Social Security,* 297 F.Supp.2d 986, 991 (N.D.Ohio,2003) (*citing Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir.1988). Specifically, the ALJ is not bound by a treating source's conclusion concerning a claimant's maximum residual functional capacity, especially when there is substantial objective medical evidence or other evidence to the contrary. *Id.* (*see Cohen v. Secretary of Dept. of Health and Human Services*, 964 F.2d 524, 528 (6th Cir.1992); *Young v. Secretary of Health and Human Services*, 925 F.2d 146, 151 (6th Cir.1990); *Hardaway v. Secretary of Health and Human Services*, 823 F.2d 922, 927 (6th Cir.1987)).

Because the Ohio Job and Family Service's regulations and standards in assessing limitations may not have the same force and effect as the statutes and regulations of the Social Security Administration, the ALJ was not bound by Dr. Bhat's conclusory statements concerning Plaintiff's maximum residual functional capacity. However, the ALJ used the formulaic recitation for discounting treating physician opinions on maximum residual functional capacity to explain why she rejected Dr. Bhat's conclusions in the BASIC MEDICAL FORM and how those reasons affected the weight accorded Dr. Bhat's opinions in that regard. The Magistrate is persuaded that the ALJ violated neither the "treating physician rule" nor the "maximum residual functional capacity rule."

**B.     DID THE ALJ ATTRIBUTE APPROPRIATE WEIGHT TO DR. GAHMAN'S OPINIONS?**

Plaintiff argues that the reports of Dr. James Gahman, M,D., a state agency reviewing physician,

are substantively inadequate because (1) they lack current information on Plaintiff's medical opinions and (2) they fail to identify credible evidence that supports a finding that Plaintiff is capable of engaging in sedentary work on a sustained basis.

      **1.**      STATE AGENCY CONSULTANT STANDARDS.

ALJs are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists.  However, State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.   20 C.F.R. §§ 404.1512(b)(8), 416.1512(b)(8) (Thomson Reuters 2014).  Therefore, the ALJ *must* consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether the claimant is disabled.  20 C.F.R. §§ 404.1512(b)(8), 416.1512(b)(8) (Thomson Reuters 2014).

A remand is not warranted in every case in which the ALJ has relied upon consultants who are unable to review a complete record.  *Blakley v. Commissioner of Social Security*, 581 F.3d 399, 409 (6[th]Cir.2009).  In fact, there are appropriate circumstances in which opinions from State agency medical consultants may be entitled to greater weight than the opinions of treating or examining sources.  *Id.* (*quoting* SOCIAL SECURITY RULING (SSR) 96–6p, 1996 WL 374180, at *3 (July 2, 1996)).  An ALJ may credit the opinion of a non-examining consultant who has failed to review a complete record, so long as he or she acknowledges that fact and articulates valid reasons for doing so.  *Id.*  In effect, there must be some indication that the ALJ at least considered these facts before giving greater weight to an opinion that is not based on a review of the complete record.  *Id.*

24

2. **THE RESOLUTION**.

a. **LACK OF CURRENT INFORMATION.**

Logic and experience dictate that portions of the medical record will typically be generated after the State agency medical consultant makes findings of fact on the medical issues; therefore, the complete record will not be within the purview of the consultant's review. Under the circumstances here, Dr. Gahman did not have access to the complete medical record. The ALJ fulfilled her responsibilities under *Blakley,* by cogently detailing Dr. Gahman's incomplete consulting opinion and crediting its relevance to Plaintiff's condition prior to July 2011 (Docket No. 12, pp. 27-28 of 645). Because there is no *Blakley* error and substantial evidence supports her finding, the ALJ's decision must be affirmed on this issue.

b. **ABILITY TO ENGAGE IN SEDENTARY WORK ON A SEDENTARY BASIS**.

In the Sixth Circuit, the standard for expert report adequacy is, to some extent, quite liberal. Consultative examiner reports like the one used in this case can, standing alone, serve as substantial evidence in support of a residual functional capacity assessment. The key is how detailed the report is. Here, Dr. Gahman employed a narrative analysis that incorporated the relevant medical evidence. He was critical of the ALJ's residual functional capacity because it did not incorporate new and material changes. Dr. Gahman's assessment references specific medical findings indicating that Plaintiff could engage in sedentary work on a sustained basis prior to July 2011.

Reliance on Dr. Gahman's report is not the sole basis for the ALJ's determination. The ALJ formulated a residual functional capacity based on a review of all the evidence and then adopted the State agency physician's opinions after determining that they were not inconsistent with the other substantial evidence in the record and they were based on substantial evidence. The ALJ reviewed all the evidence and exercising her prerogative, concluded that Plaintiff had at most, a moderate impairment

25

in his four work-related functions.  Such finding was supported by Dr. Bhat's opinion on Plaintiff's residual functional capacity that was indicative of an ability to engage in sedentary work.

Plaintiff had failed to present a principle of administrative law that requires a *per se* remand under these circumstances.  With respect to the criticism that Dr. Gahman's report lacked information on Plaintiff's entire medical history at the time of writing, the ALJ referenced this limitation in her report and made it time-specific.  The ALJ exercised her prerogative and adopted Dr. Gahman's report, not to the exclusion of the treating source, but based on substantial support in the entire record.  The Magistrate is bound by the ALJ's analysis and finding on this issue.

## C.   ACTIVITIES OF DAILY LIVING.

Plaintiff claims that the ALJ confuses the ability to perform sporadic daily living activities with the ability to sustain those activities eight hours a day for five consecutive days of the week.

### 1.   POLICY INTERPRETATION RULING TITLES II AND XVI:  ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, SSR 96-8P, 1996 WL 374184 (JULY 2, 1996).

SSR 96–8p requires the ALJ's residual functional capacity assessment to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Duderstadt v. Colvin*, 2014 WL 3508897, *8 (S.D.Ohio,2014).  In assessing residual functional capacity, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  *Id.*  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.*

    2.    **RESOLUTION**.

The ALJ accurately portrayed the record and more importantly, made a residual functional capacity assessment which included a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence such as daily activities.  In assessing residual functional capacity, the ALJ discussed Plaintiff's ability to perform sustained work activities in an ordinary work setting on a regular or an equivalent work schedule.  She considered the quality of Plaintiff's limitations, crediting his testimony regarding daily activities and their sustainability.  The ALJ considered that Plaintiff did not complain of wracking pain every minute of every day and that he occasionally reported difficulty sleeping.  Plaintiff used a motorized car when shopping, performed some household chores sporadically, appropriately cared for his grooming and hygiene, used the microwave to make simple meals, watched television and read, presumably daily (Docket No. 12, pp. 25, 59, 88 of 645).  The ALJ considered the difference between Plaintiff's ability to engage in sporadic physical activities and his ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis.  The ALJ did not place undue weight on Plaintiff's household activities and personal care but she relied on the various activities of daily living and how often Plaintiff carried out these activities.

The Magistrate is persuaded that the ALJ considered Plaintiff's ability to perform certain daily living activities and its affect on his ability to sustain work outside the home as one factor in assessing residual functional capacity.  The ALJ did not equate Plaintiff's ability to perform sporadic daily living activities solely with the ability to sustain those activities eight hours a day for five consecutive days of the week or equivalent schedule.

D.      THE ALJ'S FAILURE TO CONSIDER SSR 96-7p.

Plaintiff contends that instead of abiding by the specific and definitive rules established in SSR 96-7p regarding the evaluation of noncompliance and substance abuse issues, the ALJ unlawfully discounted Plaintiff's description of his disability and found it less severe because of either noncompliance with the prescribed drug regimen or illicit drug use.

1.      POLICY INTERPRETATION RULING TITLES II AND XVI:  EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96-7p, 1996 WL 374186 (JULY 2, 1996).

The SSR clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptoms and its functional effects.  Under this Ruling, a two-step process for evaluating the claimant's testimony and statements about symptoms has been established.  *Id.* at *2.  First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  *Id.*  If not, the symptoms cannot be found to affect the claimant's ability to do basic work activities.  *Id.*  Second, if an underlying physical or mental impairment that could reasonably be expected to produce the claimant's symptoms has been shown, the ALJ must evaluate the intensity, persistence and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit his ability to work.  *Id.*  If the claimant's statements about the intensity, persistence, or functionally limiting effects of symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record.  *Id.*

2.      RESOLUTION.

The ALJ's decision contains an acknowledgment of the procedural rules set forth in SSR 96-7p

28

followed by an evaluation correlating Plaintiff's symptoms and his underlying impairments (Docket No. 12, p. 29 of 645).  The ALJ gave generous consideration to Plaintiff's drug use and failure to take his medication to the extent that on three occasions, Plaintiff sought medical treatment after his drug use for exacerbated CAD and often, his physicians compensated for his failure to take the prescribed medication between visits.  Because his use of drugs and failure to take his medication were substantiated by objective medical evidence, the ALJ considered such evidence useful indicators of the severity, intensity and persistence of Plaintiff's symptoms and the limiting effect those symptoms had on Plaintiff's ability to work (Docket No. 12, pp. 23, 24, 27, 28, 30 of 645).  The Magistrate is persuaded that the ALJ rendered the appropriate analysis required under SSR 96-7p.

**E.**     **ANALYSIS OF DRUG ADDICTION**.

Plaintiff argues that instead of abiding by its own specific and definitive rules established in SSR 13-2p regarding the evaluation of substance abuse issues, the ALJ unlawfully discounted Plaintiff's description of his disability and found it less severe because of his drug use.

**1**.     **TITLES II AND XVI:   EVALUATING CASES INVOLVING DRUG ADDICTION AND ALCOHOLISM (DAA), SSA 13-2p, 2013 WL 621536 (2013).**

The 1996 Amendment to the Contract with America Advancement Act (CAAA) contained new and more restrictive provisions terminating benefits for SSI and DIB beneficiaries if alcoholism or drug addiction would be a contributing factor material to the Commissioner's determination that the individual is disabled. Pub. Law 104-121; 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J) (Thomson Reuters 2014).  To help the Social Security Administration abide by the CAAA, the Commissioner issued SSR 13–2p, a ruling that explains the Administration's polices as to how to consider whether drug addiction and alcoholism are material to the determination of disability.  SSR 13-2p, at *1.  The effective date of this ruling is March 22, 2013.  *Id.*

29

2.     RESOLUTION

In this case, Plaintiff makes a blanket assertion that the ALJ failed to follow the provisions of SSR 13-2p.  Plaintiff failed to reason that SSR 13-2p became effective on March 22, 2013 and the ALJ rendered her decision on December 30, 2011.  The ALJ did not have the benefit of this ruling when making her decision and there is nothing in the ruling itself suggesting retroactive application.  Even if the ALJ were compelled to consider SSR 13-2p, there is nothing in the record to show that Plaintiff ever engaged in chronic and compulsive drug seeking, use or abuse.  In fact, there is evidence that Plaintiff stopped drug use for six months prior to the hearing.  Thus, the evidence is insufficient to show that Plaintiff's drug or substance abuse is material to determining his disability.

F.     ONSET DATE OF DISABILITY.

Plaintiff argues that the Commissioner failed to follow SSR 83-20 in determining his onset date of disability.

1.     TITLES II AND XVI: ONSET OF DISABILITY TITLES II AND XVI:  ONSET OF DISABILITY, SSR 83-2p, 1983 WL 31249 (1983).

In addition to determining that an individual is disabled, the *decisionmaker* (emphasis added) must establish the onset date of disability or the first day an individual is disabled as defined in the Act and the regulations.  *Id.* at *1.  In disabilities of nontraumatic origin, factors relevant to the determination of disability onset include the individual's allegations, the work history, and the medical evidence.  *Id.*  These factors are often evaluated together to arrive at the onset date.  *Id.*  The weight to be given any of the relevant evidence depends on the individual case.  *Id.* at *2.

The starting point in determining the date of onset of disability is the individual's statement as to when disability began.  *Id.* at *2.  This is found on the disability application and on the Form SSA-3368-F8/3820-F6 (DISABILITY REPORT-ADULT FORM).  *Id.*  A change in the alleged onset date may

30

be provided in a Form SSA-5002 (REPORT OF CONTACT), a letter, another document, or the claimant's testimony at a hearing.  *Id.*  Considering work history, the decisionmaker must consider the day the impairment caused the individual to stop work.  *Id.*  This is frequently of great significance in selecting the proper onset date.  *Id.*  The district office (DO) has the responsibility for documenting the claim (via Form SSA-821-F4 (Work Activity Report--Employee) or Form SSA-820-F4 (Work Activity Report--Self-Employed Person)) concerning pertinent work activity by the claimant before or after the alleged onset date. (This information may also be needed to determine whether insured status is met or when it is first or last met.).  *Id.*

The decisionmaker must also consider medical reports containing descriptions of examinations or treatment of the individual are basic to the determination of the onset of disability.  *Id.*  The medical evidence serves as the primary element in the onset determination.  *Id.*  Reports from all medical sources (e.g., physicians, hospitals, and government agencies) which bear upon the onset date should be obtained to assist in determining when the impairment(s) became disabling.  *Id.*  Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available.  *Id.*  In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.  *Id.*

In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available.  *Id.* at *3.  When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy.  *Id.*  However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.  *Id.*

31

2.     RESOLUTION.

Here, the ALJ's onset date of disability determination is supported by substantial evidence in the record and the Magistrate can follow the ALJ's rationale for such a finding and conduct meaningful judicial review. The ALJ's finding of this onset date of disability is not based on incomplete medical histories; thus, the ALJ had no basis for inferring the onset date or seeking a medical advisory.

Rather, the ALJ provided a logical bridge between the evidence and her conclusions that the onset date of Plaintiff's disability is July 11, 2011. In fact, the ALJ engaged in a careful review of the record to ascertain Plaintiff's medical history supported by a finding of disability which began on July 11, 2011, the date of his heart surgery. She began by providing legally sufficient reasons for discounting Plaintiff's alleged onset and amended onset dates, using as a backdrop, Plaintiff's medical history and the SSR 83-10 paradigm (Docket No. 12, p. 20 of 645). The ALJ specifically pointed to assessments of both treating and examining physicians that show Plaintiff's allegation that his onset date began on June 26, 2010, was internally inconsistent with the medical evidence and not entitled to deferential weight.

The ALJ gave clear and convincing reasons which show that prior to July 14, 2011, Plaintiff had mild ischemia and intermittent chest pain that did not respond to conservative treatment for several reasons, perhaps including noncompliance with the medication therapy, illicit drug use or failure to follow medical advice. Nonetheless, the ALJ gave appropriate weight to Dr. Bhat's assessment of Plaintiff's functional capabilities and the effect that provocation of physical activities had on his deteriorating lung and heart health (Docket No. 12, pp. 23, 27, 28 of 645). The ALJ attributed "some" weight to the opinions of Drs. Rivera and Zerba, both of whom opined that prior to July 14, 2011, Plaintiff had only mild to moderate difficulties in functional limitations resulting from mental

32

impairments (Docket No. 12, pp. 24-25 of 645).  Finally, the ALJ relied on the significant evidence which suggests that the catalyst for deterioration of Plaintiff's heart and lungs was the surgery performed on July 14, 2011.

Plaintiff's inability to comprehend the issue surrounding the date last insured may be based, in part, on the manner in which the ALJ articulated her analysis under SSR 83-20.  While the ALJ did not specifically identify SSR 83-20, she articulated clearly the evidence on which she relied and the evidence she rejected in determining Plaintiff's onset date.  Because she followed the rules and her decision is based on substantial evidence, the Magistrate must defer to the ALJ's findings on this issue.

### X.  CONCLUSION.

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   November 17, 2014